[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Lamar Advantage GP Co., L.L.C. v. Cincinnati*, Slip Opinion No. 2021-Ohio-3155.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3155

LAMAR ADVANTAGE GP COMPANY, L.L.C., D.B.A. LAMAR ADVERTISING OF CINCINNATI, OH, ET AL., APPELLANTS, *v*. THE CITY OF CINCINNATI ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Lamar Advantage GP Co., L.L.C. v. Cincinnati*, Slip Opinion No. 2021-Ohio-3155.]

*First Amendment—Freedom of speech and of the press—Selective taxation—City's need to raise revenue did not justify tax imposed solely on a small number of billboard operators—Tax did not survive strict scrutiny and impermissibly infringed on rights to free speech and a free press protected by the First Amendment to the United States Constitution—Court of appeals' judgment reversed and trial court's order permanently enjoining enforcement of tax reinstated.*

(No. 2020-0931—Submitted June 16, 2021—Decided September 16, 2021.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-180675, 2020-Ohio-3377.

_____

**KENNEDY, J.**

{¶ 1} This appeal from a judgment of the First District Court of Appeals presents a single question: is a tax imposed solely upon a small number of billboard operators a discriminatory tax that violates the rights to freedom of speech and a free press protected by the First Amendment to the United States Constitution?

{¶ 2} The First Amendment, as applied to the states through the Fourteenth Amendment, protects the rights to free speech and a free press from infringement by federal, state, and local government. Among the protections that it affords to the people of this country is the prohibition against selective taxation—taxes that target only a small group of speakers or that single out the press. Whether a censorial intent is manifest or absent, a selective tax creates the intolerable potential for self-censorship by the press and abuse by governmental actors aimed to suppress, compel, or punish speech. For these reasons, a selective tax imposed on activities protected by the First Amendment, unlike a generally applicable tax, is subject to strict scrutiny and may survive only if the government justifies the tax by proving that it furthers a compelling governmental interest and is narrowly tailored to achieve that interest.

{¶ 3} Appellee the city of Cincinnati imposes a tax on outdoor advertising signs. But through definitions and exemptions within the city's municipal code, the tax burdens fall predominantly on only two billboard operators. As speakers and publishers of speech, those billboard operators may not be singled out or targeted for engaging in expression protected by the First Amendment. Although the city has an interest in raising money to support local government, the fact that there are alternative sources of revenue means that the tax cannot survive strict scrutiny. We therefore reverse the contrary judgment of the First District Court of Appeals and reinstate the trial court's order permanently enjoining the enforcement of the city's billboard tax, Cincinnati Municipal Code Chapter 313.

**Facts and Procedural History**

{¶ 4} Faced with a budget shortfall of approximately $2,500,000, the Cincinnati City Council in June 2018 passed Ordinance No. 167-2018, which enacted Cincinnati Municipal Code (hereinafter "CMC") Chapter 313 and "lev[ied] an excise tax on the privilege of installing, placing, and maintaining outdoor advertising signs in the City of Cincinnati." The city estimated that the tax would raise $709,000 to help balance the city's budget. The money raised by the billboard tax was not intended to regulate or mitigate the effects of billboards but instead was meant to fund special projects designated by city council relating to human services and public health and to restore funding to city council, the mayor, and the city clerk.

{¶ 5} As enacted, former CMC 313-1-O defined the term "outdoor advertising sign" by incorporating the definition of the term "off-site sign." CMC 1427-03-O, in turn, defines an "off-site sign" as a commercial sign that "proposes or promotes a commercial transaction to be conducted on a premises other than the premises on which the sign is located" or that "directs attention to a good, product, commodity, business, service, event, or other object that serves as the basis of a commercial transaction that is not conducted" on the premises on which the sign is located. Former CMC 313-1-O also provided that an "outdoor advertising sign" includes "an outdoor advertising sign used from time-to-time as a noncommercial sign or an on-site commercial sign."

{¶ 6} By excluding on-site signs, the city exempted numerous—potentially thousands—of advertising signs from the tax. In addition, the ordinance excluded some signs displayed in the public right-of-way (including marquees, projecting signs, and signs relating to sponsorships), CMC 895-2(a), 723, 723-1-A2, and 723-17, signs approved by the city for special events, CMC 895-2(c), and signs erected or displayed on city-owned property, including public-transit stops and streetcar stations, CMC 895-2(d), 723-6(b), and 723-13.

**{¶ 7}** The ordinance requires an "advertising host," that is, one who owns or controls an outdoor advertising sign in the city, to pay a tax that is the greater of the following: (1) 7 percent of the gross receipts generated by the outdoor advertising sign or (2) an annual minimum amount that is calculated based upon the type, location, and square footage of the sign. CMC 313-3. In addition to imposing a tax, the 2018 ordinance also prohibited an advertising host from issuing a statement to an advertiser reflecting the tax, former CMC 313-7(a), and it prohibited a host from indicating that an advertiser would absorb the cost of the tax, former CMC 313-7(b).

**{¶ 8}** Appellants, Lamar Advantage GP Company, L.L.C., d.b.a. Lamar Advertising of Cincinnati, OH, and Norton Outdoor Advertising, Inc., are "advertising hosts" as that term is defined by CMC 313-1-A1 and engage in the business of leasing billboard space for the dissemination of commercial and noncommercial speech. Owning approximately 450 and 415 billboards respectively, Lamar and Norton control most of the market for billboard advertising in Cincinnati. However, because the billboard tax would make their less profitable billboards unsustainable, Lamar and Norton have estimated that the tax might cause them to remove a total of 70 to 80 billboards. Further, due to competition with other advertising mediums, neither Lamar nor Norton would be able to pass on to their customers the cost of a 7 percent tax on gross revenues without losing business.

**{¶ 9}** The messages on Lamar and Norton's billboards are approximately 70 to 75 percent paid advertisements, and the remaining 25 to 30 percent of the advertising space is donated for public-service announcements or consists of Lamar and Norton's own speech (such as tributes to notable public figures and veterans). The paid advertisements are not only for commercial speech, however, but also include political advertisements for candidates for local office, including judges and members of city council, as well as the noncommercial speech of nonprofit

organizations, religious groups, advocacy groups, and charities. Lamar and Norton also donate advertising space to display the noncommercial speech of charities and nonprofit organizations, public-service announcements, AMBER alerts, and public-health-and-safety messages.

{¶ 10} Members of city council have contacted both Lamar and Norton to request the donation of billboard space or to press for the removal of messages with which they disagree. For example, Norton ran a paid political message from an organization stating, "Voter Fraud Is a Felony," a message that Norton did not perceive to be incorrect or inflammatory. Norton, however, "receive[d] backlash from local lawmakers." Concerned that city council members held Norton's "fate in their hands," it removed the displays. A council member also approached Lamar, expressing the belief that billboards saying, "Voter Fraud Is a Felony," amounted to voter intimidation. Lamar agreed to donate space for the counter-message that voting is a right, not a crime, and it brought that message to the public as its own political speech.

{¶ 11} As those examples show, Lamar and Norton exercise editorial control over the messages displayed on their billboards. They edit advertisements to ensure effective marketing but also review them to be sure that the information conveyed is accurate and meets community and the companies' standards. Norton, for instance, will not post advertisements that are antireligious or proabortion, and it once agreed to post an advertisement for a plastic-surgery group only after the proposed picture was made "less revealing." Nonetheless, as Lamar's vice president, Thomas Vincent Fahey, put it, Lamar is "very apprehensive to do anything that would be critical of the city," expressing concern that city council might increase taxes in retaliation if it were not "happy with whatever message [Lamar] may have delivered on [its] displays."

{¶ 12} Lamar and Norton brought separate actions in the Hamilton County Court of Common Pleas against the city and its treasurer, appellee Nicole Lee, its

director of the Department of Buildings and Inspections, appellee Art Dahlberg, and its finance director, appellee Reginald Zeno, seeking among other things a declaration that the tax violated Lamar and Norton's constitutional rights to free speech and a free press and requesting an injunction against the tax's enforcement. The trial court consolidated the cases, and after it granted a temporary restraining order and a preliminary injunction, the court permanently enjoined the city from enforcing the billboard tax, along with its provisions precluding billboard operators from telling its customers that price increases had been caused by the tax.

{¶ 13} The First District Court of Appeals affirmed in part and reversed in part, holding that the city's prohibition against speech between advertising hosts and their customers about who bore the cost of the tax violated the First Amendment. 2020-Ohio-3337, 155 N.E.3d 245, ¶ 2, 52-53. However, the court of appeals concluded that the tax itself did not violate the First Amendment, because it is content neutral and does not single out billboard operators in a way that chills or threatens to censor their speech. *Id.* at ¶ 36, 53.

{¶ 14} We accepted Lamar and Norton's separate appeals to review the same two propositions of law:

> 1. Constitutionally mandated heightened First Amendment scrutiny applies to a discriminatory excise tax on billboards that targets a small group of speakers or singles out the press.
>
> 2. [CMC] 313-7(b), the Tax's Gag Provision, prohibits political speech.

*See* 160 Ohio St.3d 1418, 2020-Ohio-4811, 154 N.E.3d 98.

{¶ 15} After this court accepted Lamar and Norton's appeals, the city amended CMC 895-1-O, which now defines the term "outdoor advertising sign" to

6

mean a sign that is leased or offered for lease by its owner to another, including for the placement of a message on the sign.  The city also repealed CMC 313-7.

{¶ 16} Because Lamar and Norton's challenges to CMC 313-7 in their second propositions of law are now moot, we confine our analysis to Lamar and Norton's first propositions of law.

### Law and Analysis

*Freedom of the Press*

{¶ 17} "Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." *Lovell v. Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).  "[M]unicipal ordinances adopted under state authority constitute state action and are within the prohibition of the amendment." *Id*.

{¶ 18} The press "includes not only newspapers, books, and magazines, but also humble leaflets and circulars," *Mills v. Alabama*, 384 U.S. 214, 219, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), book publishers, *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), and cable-television providers, *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494-495, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986).  It encompasses mediums that exercise editorial discretion in publishing the content of others in addition to their own content.  *See Preferred Communications* at 494-495.  "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell* at 452.  As Professor Eugene Volokh has explained, people during the Framing Era and at the time of the ratification of the Fourteenth Amendment understood that the freedom of the press meant the right of every person to use technology (such as the printing press) to engage in mass communication.  Volokh, *Freedom for the Press as an*

*Industry, or for the Press as a Technology? From the Framing to Today*, 160 U.Pa.L.Rev. 459, 463 (2012).

{¶ 19} Here, Lamar and Norton use printing technology for mass communication and exercise editorial discretion over the messages that they publish, and the Supreme Court of the United States has consistently rejected the proposition that the "institutional press" is afforded more protection by the First Amendment than other speakers, *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 352, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Moreover, statements "do not forfeit [First Amendment] protection because they were published in the form of a paid advertisement." *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As speakers and publishers of speech, both Lamar and Norton are protected by the rights to freedom of speech and of the press enshrined in the First Amendment to the United States Constitution.

*History of the Free-Press Clause*

{¶ 20} In *Grosjean v. Am. Press Co.*, the Supreme Court of the United States examined "the history and circumstances which antedated and attended the adoption of the abridgement clause of the First Amendment." 297 U.S. 233, 245, 56 S.Ct. 444, 80 L.Ed. 660 (1936). The court explained:

> For more than a century prior to the adoption of the amendment—and, indeed, for many years thereafter—history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government. The struggle between the proponents of measures to that end and those who asserted the right of free expression was continuous and unceasing.

*Id.* The court noted that although the right to a free press had initially contemplated the right to publish without prior restraint, "mere exemption from previous censorship was soon recognized as too narrow a view of the liberty of the press." *Id.* at 246.

{¶ 21} In 1712, Parliament had imposed a tax on newspapers and advertisements, and "the main purpose of these taxes was to suppress the publication of comments and criticisms objectionable to the Crown." *Id*. What followed, the court in *Grosjean* explained, was "more than a century of resistance to, and evasion of, the taxes, and of agitation for their repeal." *Id.* "The aim of the struggle was not to relieve taxpayers from a burden, but to establish and preserve the right of the English people to full information in respect of the doings or misdoings of their government." *Id.* at 247.

{¶ 22} Characterized as "taxes on knowledge," "the taxes had, and were intended to have, the effect of curtailing the circulation of newspapers, and particularly the cheaper ones whose readers were generally found among the masses of the people." *Id.* at 246. As the court in *Grosjean* noted, the taxes were simply a refined form of prior restraint that left the livelihoods of printers and publishers at the mercy of the commissioner of stamps. *Id*. at 247. The court pointed to the impact of the taxes on the colonies, suggesting that "these taxes constituted one of the factors that aroused the American colonists to protest against taxation for the purposes of the home government; and that the revolution really began when, in 1765 [with the Stamp Act], that government sent stamps for newspaper duties to the American colonies." *Id.* at 246. Or as one scholar has explained, it was " 'quite likely that [the tax on] paper was more emphatically an immediate cause for the outbreak of the spirit of revolt than the insipid [tea] of which so much has been written.' " (First brackets added in West.) West, *The "Press," Then & Now*, 77 Ohio St.L.J. 49, 80-81 (2016), quoting Wroth, *The Colonial Printer* 142-143 (2d Ed.1964).

{¶ 23} Reflecting on this history, the Supreme Court concluded in *Grosjean* that the First Amendment "was meant to preclude the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been effected by these two wellknown and odious methods"—i.e., the newspaper stamp tax and the tax on advertisements. 297 U.S. at 249, 56 S.Ct. 444, 80 L.Ed. 660. As the court later explained, "[t]he exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendments is as obnoxious * * * as the imposition of a censorship or a previous restraint. * * * For, to repeat, 'the power to tax the exercise of a privilege is the power to control or suppress its enjoyment.' " *Follett v. McCormick*, 321 U.S. 573, 577, 64 S.Ct. 717, 88 L.Ed. 938 (1944), quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

*The Prohibition Against Selective Taxation of the Press*

{¶ 24} The First Amendment, then, precludes the government from singling out the press for disparate treatment through selective taxation. *Grosjean* at 251.

{¶ 25} In *Grosjean*, the state of Louisiana had imposed a 2 percent tax on gross receipts from advertising, targeting publications with weekly circulations above 20,000. *Id*. at 240-241. The tax fell exclusively on 13 newspapers, while 4 other daily newspapers and 120 weekly newspapers were not taxed. *Id*. Reciting the history and tradition of the Free-Press Clause, the Supreme Court noted that the First Amendment was meant to protect against prior restraints on publication, which include taxes that curtail the amount of revenue raised by advertisements and tend to directly restrict circulation. *Id*. at 244-245, 248-249. The court pointed out that "it is not without significance that, with the single exception of the Louisiana statute, so far as we can discover, no state during the one hundred fifty years of our national existence has undertaken to impose a tax like that now in question." *Id.* at 250-251. The court invalidated the Louisiana tax "because, in the light of its history

and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Id*. at 250. That is, the tax was unconstitutional because it had "the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Id*. at 251.

{¶ 26} In *Minneapolis Star & Tribune Co. v. Minnesota Commr. of Revenue*, the Supreme Court reviewed a use tax imposed on the costs of ink and paper consumed in the production of a publication that exempted from taxation the first $100,000 in purchases for those goods in any calendar year. 460 U.S. 575, 577-579, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). The tax fell on just 14 of the 388 paid-circulation newspapers in the state in 1974, and 16 of the 374 paid-circulation newspapers in 1975, and Minneapolis Star and Tribune Company paid roughly two-thirds of the collected tax revenue for each of those years and $608,634 in 1974. *Id*. at 578-579. However, the court distinguished the facts of that case from those in *Grosjean*, because unlike the Louisiana tax at issue in *Grosjean*, "there [was] no legislative history and no indication, apart from the structure of the tax itself, of any impermissible or censorial motive on the part of the legislature." (Footnote omitted.) *Minneapolis Star & Tribune Co.* at 580. That, however, ended up being a distinction without a difference, because "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." (Emphasis sic.) *Id.* at 592.

{¶ 27} The Supreme Court explained that Minnesota had "created a special tax that applies only to certain publications protected by the First Amendment" that "is facially discriminatory, singling out publications for treatment that is, to our knowledge, unique in Minnesota tax law." *Id*. at 581. The tax did not complement the sales tax, as a traditional use tax does, because it applied to both in-state and out-of-state sales. *Id*. at 582. The court pointed out that "differential taxation of the press would have troubled the Framers of the First Amendment," *id*. at 583, because "[a] power to tax differentially, as opposed to a power to tax generally,

gives a government a powerful weapon against the taxpayer selected," *id.* at 585. With generally applicable taxes, there is little concern for censorship because there is "not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency." *Id.*

{¶ 28} Selective taxation of the press, in contrast, "can operate as effectively as a censor to check critical comment by the press." *Id.* "Further, differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* The court determined that strict scrutiny applied to its review of the tax: "Differential taxation of the press * * * places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Id.* And the state's need to raise revenue "cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoiding the censorial threat implicit in a tax that singles out the press." (Footnote omitted.) *Id*. at 586.

{¶ 29} The Supreme Court gave an alternative reason for striking down the tax: "Minnesota's ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers. The effect of the $100,000 exemption enacted in 1974 is that only a handful of publishers pay any tax at all, and even fewer pay any significant amount of tax." *Minneapolis Star & Tribune Co.*, 460 U.S. at 591, 103 S.Ct. 1365, 75 L.Ed.2d 295. Although the state attempted to justify the selective tax on the grounds that it was necessary to provide an equitable tax system, the court questioned the state's commitment to equity because the state had not extended the tax treatment to small

businesses generally. *Id.* The court concluded, "And when the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Id.* at 592.

{¶ 30} In *Arkansas Writers' Project, Inc. v. Ragland*, the Supreme Court addressed a tax that subjected general-interest magazines to a sales tax on tangible personal property but provided exemptions for newspapers and religious, trade, professional, and sports magazines. 481 U.S. 221, 224, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). A general-interest-magazine publisher subject to the tax challenged it on First Amendment grounds. *Id*. at 224-225. The court invalidated the tax, determining that "it targets a small group within the press," *id.* at 229, and "cannot be characterized as nondiscriminatory, because it is not evenly applied to all magazines," *id.* Although the tax was viewpoint neutral, it required authorities to review the content of the magazines to determine whether they fit into the exemption for religious, trade, professional, and sports magazines, and "[s]uch official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press." *Id.* at 230. The court concluded that Arkansas had "advanced no compelling justification for selective, content-based taxation of certain magazines" and therefore held that the tax was "invalid under the First Amendment." *Id.* at 234. For this reason, the court determined that it was unnecessary to decide "whether a distinction between different types of periodicals presents an additional basis for invalidating the sales tax, as applied to the press." *Id*. at 233.

{¶ 31} The Supreme Court addressed this question in *Leathers v. Medlock*, considering "whether the First Amendment prevents a State from imposing its sales tax on only selected segments of the media." 499 U.S. 439, 444, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). The Arkansas tax at issue in *Leathers* applied "to receipts from the sale of all tangible personal property and a broad range of services,"

including utilities, telecommunications, lodging, alterations, cleaning, repairs, printing, admission to recreational events and facilities, and cable television. *Id*. at 447. However, the law provided exemptions from the tax for newspapers and magazines. *Id.* at 443. A cable-television customer, a cable-television provider, and a trade organization composed of approximately 80 cable-television providers from across the state filed suit to enjoin the tax as applied to cable-television services. *Id*. at 442.

{¶ 32} The court acknowledged that cable-television providers engage in speech and that in much of their operation they are part of the press. *Id*. at 444. It explained, however, that the fact "[t]hat [cable television] is taxed differently from other media does not by itself * * * raise First Amendment concerns." *Id.*

{¶ 33} The court determined that the tax on cable television was not like the taxes that it had invalidated in *Grosjean*, *Minneapolis Star & Tribune Co.*, and *Arkansas Writers' Project*. *Leathers* at 447-448. Unlike the tax at issue in *Grosjean*, the Arkansas cable-television tax was not intended to interfere with the cable-television provider's First Amendment activities by suppressing the circulation of information. *Leathers* at 444-445, 448. Unlike the tax at issue in *Minneapolis Star & Tribune Co.*, the cable-television tax did not single out the press for special treatment or target a small number of speakers to bear the burden of the tax. *Leathers* at 447-448. And unlike the tax at issue in *Arkansas Writers' Project*, application of the cable-television tax did not require consideration of the speech's content. *Leathers* at 446. Further, while the tax in in *Arkansas Writers' Project* applied to, at most, three publishers, *Leathers* at 448, the tax at issue in *Leathers* "extended * * * uniformly to the approximately 100 cable systems then operating in the State," *id.* The court noted, "This is not a tax structure that resembles a penalty for particular speakers or particular ideas." *Id*. at 449. The court in *Leathers* then concluded:

14

The Arkansas Legislature has chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment.

*Id.* at 453.

{¶ 34} From these cases, we distill the following principles. First, the press may be subjected to a generally applicable tax. *Leathers*, 499 U.S. at 447, 111 S.Ct. 1438, 113 L.Ed.2d 494; *see also Fed. Trade Comm. v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 446, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (Brennan, J., concurring in part and dissenting in part), quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 708, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (O'Connor, J., concurring) (" 'the arrest of a newscaster for a traffic violation,' for example, does not offend the First Amendment"). As the court explained in *Minneapolis Star & Tribune Co.*, there is no reason to believe that the government might use a generally applicable tax to censor, control, or punish speech if the tax puts the same burden on the rest of its constituency. 460 U.S. at 585, 103 S.Ct. 1365, 75 L.Ed.2d 295. "[S]uch laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 761, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

{¶ 35} Second, a tax is unconstitutional if an official must look at the content of speech to determine whether the tax applies to it. *Arkansas Writers' Project, Inc.*, 481 U.S. at 230, 107 S.Ct. 1722, 95 L.Ed.2d 209.

{¶ 36} Third, a tax that selectively singles out the press or targets a small group of speakers creates the danger that the tax will be used to censor speech. *Minneapolis Star & Tribune Co.* at 591. This is true even if the tax singles out the press to its benefit: "the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but with the possibility of subsequent differentially *more burdensome* treatment." (Emphasis sic.) *Id.* at 588. "[T]he threat of burdensome taxes * * * can operate as effectively as a censor to check critical comment by the press," *id.* at 585, creating the "twin threats of self-censorship and undetectable censorship," *Lakewood* at 762.

{¶ 37} Lastly, it is not necessary to prove that the purpose of a tax is to suppress or punish speech to establish that the tax violates the First Amendment. "[E]vidence of an improper censorial motive" is not needed. *Arkansas Writers' Project* at 228. The structure of the tax itself in imposing greater burdens on the press or on speech may either raise a suspicion that it was intended to interfere with expression protected by the First Amendment or create an unacceptable potential for the government to use the tax to suppress, control, or punish expression. *Leathers*, 499 U.S. at 446-449, 453, 111 S.Ct. 1438, 113 L.Ed.2d 494. As the court explained in *Minneapolis Star & Tribune Co.*, "Whatever the motive of the legislature * * *, we think that recognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents *such a potential for abuse* that no interest suggested by [the government] can justify the scheme." (Emphasis added.) 460 U.S. at 591-592, 103 S.Ct. 1365, 75 L.Ed.2d 295. Because a selective tax creates such a potent tool for censorship, it offends the First Amendment.

### The Billboard Tax Is Unconstitutional

{¶ 38} Applying these principles, we conclude that the city's selective tax on billboards violates the First Amendment. We reject the city's argument that the billboard tax is a tax on the noncommunicative aspects of billboards. Tax liability

16

under the municipal ordinance does not attach simply because a sign is built or already exists—it also requires that the sign is leased or offered for lease by its owner to another. Further, we reject the city's contention that the ordinance taxes only a commercial transaction. The ordinance taxes advertising revenue in the same way that the tax invalidated by the Supreme Court in *Grosjean* did, and it taxes the means of communication like the ink-and-paper use tax that was struck down by the court in *Minneapolis Star & Tribune Co.*

{¶ 39} And unlike the tax at issue in *Leathers*, the tax in this case is not generally applicable. It does not apply to all or many businesses equally, and it is not part of a broader tax on property or services that burdens other segments of the economy. It does not apply to all advertisers—or even to all advertising signs. As previously enacted, it excluded from taxation signs similar to those of Lamar and Norton's if they advertised goods or services provided on the same premises on which the sign was located, *see* former CMC 313-1-O and current CMC 1427-03-O, and, as amended, it still excludes many of those signs, because the tax applies only to signs that are leased or offered for lease to third parties, CMC 895-1-O. The ordinance further winnows the types of signs that are subject to the tax, excluding some signs displayed in the public right-of-way (including marquees, projecting signs, and signs relating to sponsorships), CMC 895-2(a), 723, 723-1-A2, and 723-17, signs approved by the city for special events, CMC 895-2(c), and signs erected or displayed on city-owned property, including public-transit stops and streetcar stations, CMC 895-2(d), 723-6(b), and 723-13. The tax also excludes all signs under 36 square feet in size, CMC 313-5(a)(iii), but none of Lamar or Norton's signs are that small.

{¶ 40} By enacting those exceptions, the city has targeted a small group of speakers to bear most of the burden of a tax intended to raise $709,000 for the purpose of balancing the city's budget. Because that tax burden is not spread across city council's constituency but is instead imposed predominantly on two companies

(Lamar and Norton), the political process may not alleviate the potential that the tax might be used to suppress, control, or punish speech. Instead, the tax is structured in a way that burdens activities protected by the First Amendment and creates a potent tool for censorship. The evidence shows that the city's council members had not been shy in asking Lamar and Norton to donate billboard space for their projects or in seeking the removal of messages with which they disagreed. The tax on Lamar and Norton's advertising revenue only increases that pressure. Even if the city passed the tax ordinance without a motive to censor billboard operators, the threat of overt censorship, self-censorship, or undetectable censorship created by the tax impermissibly infringes on rights protected by the First Amendment.

{¶ 41} The city's billboard tax resembles the type of taxes that were a cause of the American Revolution: taxes that curtail the amount of revenue raised by the press through advertisements and tend to directly restrict the circulation of protected expression. And it burdens First Amendment activities—the undisputed evidence is that the tax will require Lamar and Norton to remove almost 10 percent of their billboards, limiting the dissemination of protected content. As the Supreme Court instructed in *Minneapolis Star & Tribune Co.*, 460 U.S. at 585-586, 103 S.Ct. 1365, 75 L.Ed.2d 295, strict scrutiny applies and the government bears the burden to prove that the tax ordinance survives that scrutiny. *See also Reed v. Gilbert*, 576 U.S. 155, 171, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015).

{¶ 42} The city enacted the billboard-tax ordinance to raise revenue. But as the Supreme Court has determined:

> Standing alone, [the need to raise revenue] cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the [city] could raise the revenue by taxing

businesses generally, avoiding the censorial threat implicit in a tax
that singles out the press.

(Footnote deleted.) *Minneapolis Star & Tribune Co.* at 586.

{¶ 43} We therefore hold that the city's billboard tax infringes on the rights to free speech and a free press protected by the First Amendment to the United States Constitution.

{¶ 44} We acknowledge that the Court of Appeals of Maryland, in *Clear Channel Outdoor, Inc. v. Dir., Dept. of Fin. of Baltimore*, recently upheld Baltimore's tax on the privilege of selling advertising space on billboards against claims that the tax infringed on the rights to free speech and a free press. 472 Md. 444, 477-478, 247 A.3d 740 (2021). We do not find its analysis to be persuasive.

{¶ 45} First, the court concluded that the tax did not single out the press because nothing indicated that the tax was intended—or raised suspicion that it was intended—to interfere with protected speech. *Id.* at 471-472. However, as the United States Supreme Court explained in *Minneapolis Star & Tribune Co.*, a purpose to censor is not required for a tax to violate the First Amendment. 460 U.S. at 592, 103 S.Ct. 1365, 75 L.Ed.2d 295. The Maryland court also noted that the Baltimore tax had no effect on the billboard owners' circulation of messages. *Clear Channel Outdoor, Inc.* at 472. In contrast, Lamar and Norton presented uncontradicted evidence that the city's billboard tax would require them to remove their less profitable billboards.

{¶ 46} Second, the Maryland court determined that the Baltimore tax did not target a small number of speakers; but the court reached that conclusion only after it excluded from its analysis other commercial signs that were not subject to the tax. *Id.* at 473-474. However, the Baltimore tax—which was projected to raise between $1 million and $2 million annually—applied only to four billboard operators, with Clear Channel Outdoor, Inc., paying approximately 90 percent of

the revenue generated by the tax. *Id.* at 451-452. And although the court attributed that disparity to "market conditions" caused by the consolidation of ownership of the limited number of billboards allowed in the city, *id.* at 474, that does not change the fact that Baltimore enacted a tax that applies to only a small number of speakers that overwhelmingly bear the burden of a tax on a medium of expression.

{¶ 47} We therefore decline to adopt the Maryland high court's analysis in *Clear Channel Outdoor, Inc.*

**Conclusion**

{¶ 48} "The basic premise of the First Amendment is that all present instruments of communication, as well as others that inventive genius may bring into being, shall be free from governmental censorship or prohibition." *Kovacs v. Cooper*, 336 U.S. 77, 102, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Black, J., dissenting). Included in the guarantee of free speech and a free press is the prohibition against selective taxation that is designed to suppress, control, or punish speech or that is structured in such a way that the tax creates an unacceptable potential for censorship by the government or self-censorship by speakers and publishers.

{¶ 49} The city of Cincinnati has imposed such a discriminatory tax, singling out members of the press and placing the tax's burden on a small group of speakers and publishers in a way that both directly limits the circulation of protected speech and creates the danger that speech will be added or removed based on a desire to please, or avoid the wrath of, city council. That the tax involves billboards rather than the institutional press is of no consequence, and strict scrutiny applies. And because the city's need to raise revenue does not justify its selective tax on speech and the press, the tax does not survive strict scrutiny and therefore impermissibly infringes on the rights to free speech and a free press enshrined in the First Amendment to the United States Constitution.

{¶ 50} For these reasons, we reverse the judgment of the First District Court of Appeals and reinstate the trial court's order permanently enjoining the enforcement of Cincinnati Municipal Code Chapter 313.

Judgment reversed
and injunction reinstated.

O'CONNOR, C.J., and FISCHER, DEWINE, STEWART, and LASTER MAYS, JJ., concur.

DONNELLY, J., concurs in judgment only.

ANITA LASTER MAYS, J., of the Eighth District Court of Appeals, sitting for BRUNNER, J.

_____

Strauss Troy Co., L.P.A., R. Guy Taft, and Stephen E. Schilling, for appellant Lamar Advantage GP Company, L.L.C., d.b.a. Lamar Advertising of Cincinnati, OH.

Robbins, Kelly, Patterson & Tucker, L.P.A., Michael A. Galasso, and Esther M. Norton, for appellant Norton Outdoor Advertising, Inc.

Andrew W. Garth, Cincinnati City Solicitor, Marion E. Haynes III, Chief Counsel, and Kevin M. Tidd, Assistant City Solicitor, for appellees.

Sidley Austin, L.L.P., Virginia A. Seitz, and Christopher S. Ross, urging reversal for amicus curiae Outdoor Advertising Association of America, Inc.

Graydon, Head & Ritchey, L.L.P., and John C. Greiner, urging reversal for amici curiae Outdoor Advertising Association of Ohio, Ohio Association of Broadcasters, Ohio News Media Association, The E.W. Scripps Company, and Block Communications, Inc.

_____