**[This opinion has been published in *Ohio Official Reports* at __ Ohio St.3d __.]**

IN RE DISQUALIFICATION OF WOLLSCHEID.

THE STATE OF OHIO *v*. HENDERSON.

**[Cite as *In re Disqualification of Wollscheid*, 2024-Ohio-6176.]**

*Judges—Affidavits of disqualification—R.C. 2701.03 and 2701.031—Affidavit dismissed as to Judge Beathard because he has not been assigned to underlying case—Request for disqualification of Judge Wollscheid granted because although evidence does not show actual bias or prejudice, a reasonable and objective observer would harbor serious doubts about fairness of defendant's trial before her.*

(No. 24-AP-134—Decided October 31, 2024.)

ON AFFIDAVIT OF DISQUALIFICATION in Washington Court House Municipal Court Case No. CRB2400308.

————————

**KENNEDY, C.J.**

{¶ 1} Cody Henderson, the defendant in the underlying criminal case, has filed an affidavit of disqualification pursuant to R.C. 2701.03 and 2701.031 seeking to disqualify Judge Susan R. Wollscheid of the Washington Court House Municipal Court from presiding over the case. At paragraph 16 of the affidavit of disqualification, Henderson also requests the disqualification of Acting Judge Steven P. Beathard. Judge Wollscheid filed a response to the affidavit of disqualification. Judge Beathard was not asked to file a response.

{¶ 2} As explained below, the affidavit of disqualification is dismissed as to Judge Beathard. The affidavit of disqualification is granted as to Judge Wollscheid because a reasonable and objective observer would harbor serious doubts about the fairness of Henderson's trial before Judge Wollscheid. Therefore, to allay any concerns about the fairness and integrity of the proceedings and to

ensure the parties and the public the unquestioned neutrality of the trial judge, Judge Wollscheid is disqualified from presiding over the underlying case. The appointment of a new assigned judge to preside over the case will be addressed in a separate entry.

**Trial-Court Proceedings**

{¶ 3} On June 17, 2024, Henderson was arrested for menacing, a violation of R.C. 2903.22(A)(1)(a). The alleged victim of the offense was a sheriff's deputy, Lieutenant John M. Warnecke. Judge Wollscheid arraigned Henderson on June 20.

{¶ 4} At the beginning of the arraignment hearing, Henderson asserted that he was entering a "special appearance" on the basis that the charging complaint was legally deficient. The judge interrupted Henderson and stated that she understood but that "there [we]re a few things that [she had] to go over with [him]," and she was going to go through that process first. Henderson apologized to Judge Wollscheid, and the judge proceeded.

{¶ 5} The judge asked Henderson whether he had watched "the rights video" and whether he understood those rights. Henderson responded "yes" to both questions. He then signed a document stating that he had watched the video and that he understood his rights.

{¶ 6} Judge Wollscheid explained to Henderson the nature of the charge against him and the maximum possible penalties that could be imposed if he were convicted of the offense. When asked whether he understood the nature of the charge against him and the maximum possible penalties, Henderson again responded "yes."

{¶ 7} Judge Wollscheid then asked Henderson, "How would you like to plead today?" At that time, Henderson reprised his earlier statement that he was entering a "special appearance" because the charging complaint failed to comply with Crim.R. 4 and because he was never served with a summons. Based on those purported defects, Henderson asserted, he did not have to enter a plea because an

arraignment was "not proper" at that time.  The judge responded, "Well, I'm telling you that that's what I expect, is a plea from you today.  I don't care which one you want to do and how you want to pursue this argument, it's fine with me."

**{¶ 8}** Henderson then told Judge Wollscheid that he would enter a plea once he was properly served with a summons in accordance with Crim.R. 4.  He stated that all he was asking was for the judge to "follow the law, including procedural law."

**{¶ 9}** Judge Wollscheid then went off the record.  Upon going back on the record, the judge told Henderson that he was not served with a summons because he was given his arraignment date at the time he bonded out of jail.  Henderson disagreed about the timing of the process and wanted to preserve his objection for appeal.  Judge Wollscheid stated that his objection was on the record.  The judge then asked Henderson how he wanted to plead.

**{¶ 10}** Before entering a plea, Henderson asked about a pending motion for the return of seized property.  Judge Wollscheid stated that the motion would be addressed after the arraignment, and she reminded him that she needed to handle the matters related to the arraignment first.  Henderson then entered a plea of not guilty.

**{¶ 11}** After entering the plea, Henderson again asked about his motion for the return of his seized property.  He explained that he was a journalist, that the police department had his GoPro camera, and that the camera was important to him.

**{¶ 12}** Without acknowledging or resolving the motion for the return of seized property, Judge Wollscheid noted Henderson's not-guilty plea for the record.  The following exchange then occurred:

> JUDGE WOLLSCHEID: I do have an application for public defender to get somebody to represent you.  Is that your desire?  Do you want me to appoint somebody to represent you, Sir?

3

HENDERSON: Um—

JUDGE WOLLSCHEID: I would highly recommend it.

HENDERSON: Your Honor, I'm [a] pro se attorney. I'll be my own attorney in this case.

JUDGE WOLLSCHEID: Okay. Well tell you what, what I'm going to do is I'm going to appoint somebody on your case—

HENDERSON: They can be cocounsel.

JUDGE WOLLSCHEID: That works for me.

HENDERSON: Okay, Your Honor.

JUDGE WOLLSCHEID: Okay?

HENDERSON: Yes, Your Honor.

JUDGE WOLLSCHEID: That way, you have somebody with legal expertise that can help guide you, okay?

HENDERSON: Yes, Your Honor.

JUDGE WOLLSCHEID: Is that agreeable?

HENDERSON: I respect that.

JUDGE WOLLSCHEID: Alright.

{¶ 13} Judge Wollscheid appointed Thomas Arrington to represent Henderson. The following exchange then occurred:

HENDERSON: When would be the soonest that we could possibly schedule this very hearing, Your Honor?

JUDGE WOLLSCHEID: That is something that we need to discuss because all cases have time limits. Okay?

HENDERSON: Right.

JUDGE WOLLSCHEID: If you would choose to waive time, that gives us more room to work with, because—

HENDERSON: Uh no, Your Honor, I don't waive any rights.

JUDGE WOLLSCHEID: Okay, well, that's your choice. So that means that this will immediately get set for trial.

HENDERSON: Well, I need a pretrial to be able to, you know—

JUDGE WOLLSCHEID: Okay—

HENDERSON: Discuss pretrial motions and make motions and such.

JUDGE WOLLSCHEID: And that's why I'm asking, do you want to waive time?

HENDERSON: I still have a right—

JUDGE WOLLSCHEID: It's just the time frame—

HENDERSON: I still have a right to a pretrial without waiving my time.

JUDGE WOLLSCHEID: There's no way that you're going to have that schedule—

HENDERSON: For an M-1, I believe that's, what, 180 days to bring me to trial, and for the speedy trial limits, or 90 days, maybe? Can you quote that statute?

JUDGE WOLLSCHEID: 90 days. Now, this will be scheduled not only with our schedule but with Mr. Arrington's schedule as well.

HENDERSON: Right, and I understand that. But what I'm saying is between 90 days, that should be plenty of time. I've had some cases where I received misdemeanors, M-1s, in the state of Ohio where I received 2 pretrials in that 90 days and a trial.

JUDGE WOLLSCHEID: Well, I'm just letting you know.

HENDERSON: So, I'm not willing to waive my right to a pretrial at all.

JUDGE WOLLSCHEID: That's fine.

HENDERSON: And I wanted that noted as well on the docket as an appealable issue of the case that I'm not given a pretrial, if you're telling me I don't have a right to a pretrial.

JUDGE WOLLSCHEID: You're on the record; that's noted.

HENDERSON: Okay. Yeah, if you're telling me I don't have the right to a pretrial—

JUDGE WOLLSCHEID: I'm not telling you you don't have a right; I'm telling you that if you waive time, then we can schedule it with the attorney.

HENDERSON: Your Honor, the claim and exercise of one constitutional right does not require the surrender of another, and the speedy trial is my constitutional right, and so is a fair trial with the with the proper—

JUDGE WOLLSCHEID: You waive or you don't, I don't really care one way or the other—

HENDERSON: —with the proper pretrial, so therefore, I choose to keep my constitutional right to a speedy trial, and I choose to keep my constitutional right to a fair and impartial trial, which includes a pretrial conference. So that's my claim of constitutional rights.

JUDGE WOLLSCHEID: And we will see if your attorney can get it done and within the time.

HENDERSON: Well then, I don't need an attorney, and then I want a pretrial on my schedule then, schedule then. I would like to—if you're telling me it's based on my attorney.

JUDGE WOLLSCHEID: Well, it'll be on my court schedule—

HENDERSON: Well, I hope that your court has [an] opening for a pretrial between now and 90 days from now. And I'm requesting one—verbally—right here. A pretrial—

JUDGE WOLLSCHEID: Next available.

HENDERSON: —to be scheduled.

JUDGE WOLLSCHEID: Next available.

HENDERSON: And I need the right to a discovery to be served to me before then.

JUDGE WOLLSCHEID: You will need to file that—

HENDERSON: I could serve it tomorrow.

JUDGE WOLLSCHEID: You or your attorney will file that request with the prosecuting attorney.

HENDERSON: I'll file it tomorrow. If you can include information for Mark Pitstick, or whoever the prosecuting attorney for this case is, so I can file that with them, I will do so tomorrow. But I'm not going to be denying my right of the pretrial; that's ridiculous, Your Honor. Due Process Clause of the Fifth Amendment.

JUDGE WOLLSCHEID: I'm not trying to get into any kind of little battle with you, Sir. I am just trying to tell you how it's done—

HENDERSON: I'm just exercising my constitutional right; it's not a battle, Your Honor.

. . .

HENDERSON: I want to put it on the record that this will be a jury trial as well. So, this is an official motion for a jury trial.

JUDGE WOLLSCHEID: You'll need to go ahead and file that you're demanding a jury. It's done in writing as well, Sir.

HENDERSON: To the court or to the prosecutor?

JUDGE WOLLSCHEID: You file it with the court, and you serve the prosecutor a copy.

HENDERSON: Okay, thank you, Your Honor.

JUDGE WOLLSCHEID: And this is why I want you to have Mr. Arrington, because he knows these rules.

{¶ 14} The case was then set for a pretrial hearing on July 25 at 10:00 a.m. and for a trial on August 2 at 8:30 a.m. Toward the conclusion of the arraignment, Judge Wollscheid stated that Henderson "want[ed] his case tried within the time provided by law." And then, despite Henderson's statement that he would represent himself, the judge stated that she had appointed Arrington as counsel.

{¶ 15} On June 20, Henderson filed an amended motion for the return of his GoPro camera, which the police had seized. On that same date, he moved to reduce bail from a cash bond to an unsecured bond.

{¶ 16} On July 3, Arrington filed a notice of appearance, a request for a pretrial hearing, a waiver of Henderson's right to a speedy trial, and a request for discovery. Despite Arrington's entering an appearance as counsel, on July 10, Judge Wollscheid granted Henderson's pro se motion to reduce bond.

{¶ 17} On July 25, Henderson appeared for a pretrial hearing and was represented by Arrington. Arrington informed Judge Wollscheid that the prosecution had produced in discovery a disk represented to contain the footage from a body camera worn by one of the officers who arrested Henderson and that Lieutenant Warnecke had agreed to download the video from Henderson's GoPro camera so that the camera could be returned to Henderson the following week. Arrington asked the judge to vacate the August 2 trial date and requested another

pretrial hearing, which the judge set for August 8. Judge Wollscheid asked Henderson whether he understood what was happening and whether he agreed. Henderson said yes.

{¶ 18} The following exchange then occurred:

> JUDGE WOLLSCHEID: Did I understand you correctly that the officers are removing the video from the [GoPro camera]?
>
> ARRINGTON: One of the videos, yes, Your Honor.
>
> JUDGE WOLLSCHEID: And that is the evidence that was for this specific case?
>
> ARRINGTON: One of, yes, Your Honor.
>
> JUDGE WOLLSCHEID: And the rest of the GoPro and everything will be returned to Mr. Henderson?
>
> ARRINGTON: Yes, Your Honor.
>
> JUDGE WOLLSCHEID: Alright. You previously had a motion in for that?
>
> ARRINGTON: Yes, Your Honor.
>
> JUDGE WOLLSCHEID: Since there was evidence on it, that's why your motion was denied. I'm glad that you all worked it out.
>
> HENDERSON: And I completely intended and hoped that that video would make it to the prosecution. I just wanted my actual filming device . . . .

{¶ 19} The pretrial conference report did not document that the disk filed with the court allegedly included the footage from the officer's body-worn camera, the statement that the officers were making a copy of the relevant GoPro video, or that the police department was going to return Henderson's GoPro camera on the

following Monday. On that same day, Henderson made a public-records request for the original video with audio from the arraignment hearing held on June 20.

{¶ 20} On August 2, Ethan Womack of Omniversal Media, L.L.C., submitted a "media access request" form pursuant to Sup.R. 12. Womack requested media access to the proceeding scheduled for August 8 for "[a]udio/video recording outside," to "[a]udio/video record," and to "[p]hotograph the courtroom." That same day, without a hearing, Judge Wollscheid denied the media-access request.

{¶ 21} Judge Beathard was presiding as an acting judge in the Washington Court House Municipal Court on August 8. When Henderson's case was called, Judge Beathard stated that this was a final pretrial hearing. Arrington abruptly stated that it could not be the final pretrial hearing because the case was still in the discovery phase. Arrington told the court that he played the disk filed with the court but that there was nothing on the disk, and he stated that he needed a continuance to review it when produced. Judge Beathard then asked the State for its position on the issue of discovery. Arrington stated that he believed that the State had not known that the disk did not contain the body-cam video. Judge Beathard asked Arrington when he would be back in court, and after Arrington responded, Judge Beathard noted that there was no written jury demand filed in the case. Arrington said that a jury demand would be filed, and Judge Beathard set a pretrial hearing for August 22.

{¶ 22} Henderson then attempted to object, asserting that the State had not turned over a video. The judge told Henderson that if he wanted to hear from Henderson, then he would ask. Arrington stated that the GoPro camera had not been returned to Henderson and requested an order to release the camera since it no longer had evidentiary value. Judge Beathard noted that Judge Wollscheid had already denied Henderson's motion seeking return of the camera. Henderson persisted, asserting that he had a constitutional right to speak and raising the denial of Omniversal Media's request for media access to the hearing. Judge Beathard

ordered Henderson to leave the courtroom, saying the hearing was over. Prior to Henderson leaving, the judge verified for Henderson that the next pretrial hearing was set for August 22 at 10:00 a.m.

{¶ 23} The pretrial-conference report did not indicate that the disk produced in discovery lacked the footage from the body-worn camera, that Arrington was not provided with a copy of the video the officers were supposed to copy from the GoPro camera, or that the police did not return the GoPro camera to Henderson. The only information entered in the "Stipulated to by the Parties" section was "Continued to obtain and review video." On that same date, Henderson filed a public-records request for a copy of the media request that Omniversal Media had filed and Judge Wollscheid had denied.

{¶ 24} On August 12, Henderson filed a "notice of disqualification and discharge," seeking Arrington's discharge for ineffective assistance of counsel, legal malpractice, and failure to assert Henderson's constitutional rights. Henderson also filed a "notice of special appearance" stating that that he had made a special appearance and that the court lacked personal jurisdiction over him. That same day, Caden Reed of Omniversal Media submitted a "media access request" form pursuant to Sup.R. 12. Reed requested media access to the proceeding scheduled for August 22—specifically, "[a]udio/video recording outside" and to "[a]udio/video record." That same day, without holding a hearing, Judge Wollscheid denied the media-access request.

{¶ 25} On August 21, Henderson filed a motion to continue the August 22 pretrial hearing based on the State's continued failure to provide discovery.

{¶ 26} On August 27, Henderson filed this affidavit of disqualification.

**Affidavit-of-Disqualification Proceedings**

{¶ 27} R.C. 2701.031 provides that if a judge of a municipal or county court "allegedly is interested in a proceeding pending before the judge, allegedly is related to or has a bias or prejudice for or against a party to a proceeding pending

before the judge or to a party's counsel, or allegedly otherwise is disqualified to preside in a proceeding pending before the judge," then that party or the party's counsel may file an affidavit of disqualification with the clerk of this court.

{¶ 28} Before Henderson's allegations against Judge Wollscheid are addressed, it should first be noted that Henderson has alleged that Judge Beathard should be disqualified because the judge is biased and prejudiced against Henderson and to avoid the appearance of impropriety. As stated above, Judge Beathard was not asked to file a response.

{¶ 29} Henderson's affidavit of disqualification therefore raises a preliminary issue: whether an affidavit of disqualification against Judge Beathard may proceed when the judge has not been assigned to preside in the underlying case. It cannot.

*A Proceeding Must Be Pending Before the Judge*

{¶ 30} As noted above, R.C. 2701.031 states that an affidavit may be filed if a municipal-court judge "allegedly is interested in a proceeding *pending before the judge*, allegedly is related to or has a bias or prejudice for or against a party to a proceeding *pending before the judge* or to a party's counsel, or allegedly otherwise is disqualified to preside in a proceeding *pending before the judge*." (Emphasis added.)

{¶ 31} Under the plain and unambiguous language of R.C. 2701.031, the chief justice's authority to order the disqualification of municipal-court judges extends to those matters in which a proceeding is pending before the judge. It is well settled that this language "limits the authority of the [c]hief [j]ustice in determining the existence of interest, bias, prejudice, or disqualification to matters pending before the court." *In re Disqualification of Grossmann*, 74 Ohio St.3d 1254, 1255 (1994). "[T]he chief justice cannot rule on an affidavit of disqualification when . . . nothing is pending before the . . . court." *In re Disqualification of Hayes*, 2012-Ohio-6306, ¶ 6.

{¶ 32} Therefore, the chief justice has dismissed affidavits of disqualification in which a litigant attempted to remove a judge from a closed or inactive case. *See, e.g.*, *In re Disqualification of Kubilus*, 2018-Ohio-5412, ¶ 3; *In re Disqualification of Thomakos*, 2020-Ohio-6874, ¶ 3.

{¶ 33} Judge Beathard presided in court on August 8 during one of Henderson's pretrial hearings. While the judge presided over that one hearing, Judge Beathard has not been assigned to the underlying criminal case. Therefore, there is no authority to grant the affidavit of disqualification as it pertains to Judge Beathard. The affidavit of disqualification is dismissed as to Judge Beathard.

*Allegations Against Judge Wollscheid*

{¶ 34} Henderson alleges that Judge Wollscheid is biased and prejudiced against him and that he should be disqualified to avoid the appearance of impropriety.

{¶ 35} In support of the allegations, Henderson claims that the judge has violated his right to self-representation under the Sixth Amendment to the United States Constitution. He states that during the arraignment hearing, he preserved his right to self-representation and signed a form for court-appointed counsel to be stand-by counsel only. He asserts that he proceeded with counsel "at [the] request of" Judge Wollscheid and that he indicated during the hearing that Arrington would serve as cocounsel.

{¶ 36} Henderson maintains that during the arraignment hearing, he asserted his constitutional right to a speedy trial and told Judge Wollscheid to schedule the proceedings based on his schedule, not Arrington's. And he says he told the judge that if Arrington's schedule was going to control the timing of the case, then he did not want counsel. Henderson asserts that Arrington did not have his permission to waive his right to a speedy trial, and he contends that Arrington should not have moved for a continuance when the State failed to provide discovery, because providing discovery was the prosecutor's obligation and

speedy-trial time should have run against the State. Henderson subsequently terminated Arrington's representation, alleging ineffective assistance and malpractice.

{¶ 37} Henderson also claims that Judge Wollscheid improperly denied media access to the proceedings in his case. He states that he is a journalist with a YouTube channel and that his work "expos[es] public officials for misconduct and malfeasance." He says that Omniversal Media contacted him and wanted to broadcast the proceedings in his case. Henderson asserts that this type of broadcasting is "necessary for an open society of transparency, and the administration of fair and public trials in the Modern age of Technology, whereas most people watch Television, Internet Live Streams, YouTube and TikTok for their information." Henderson believes that Sup.R. 12 requires that media be permitted to access court proceedings with "proper respects to guidelines."

{¶ 38} Henderson points to the numerous public-records requests he has submitted to the Washington Court House Municipal Court clerk's office and notes that the clerks had "all closed their windows down and refused to speak to [him] or serve [him] in any capacity." He adds that the clerks called the Washington Court House Police Department to remove him, labeling him as "disruptive for speaking legal facts."

{¶ 39} Judge Wollscheid denies being biased or prejudiced against Henderson and denies that there is any basis for her disqualification. The judge claims that during the arraignment, she attempted to go through the "process" but that Henderson started "blurting out his claims of failure to serve" and that during the hearing he "went off" on other "rant[s]." Judge Wollscheid states that she appointed counsel to represent Henderson "to protect Mr. Henderson's rights." She says that "Mr. Henderson was filing motions without proper service and demanding to be heard on them immediately, so [she] did not want this to become an issue."

The judge admits that Henderson stated that he was a "pro se attorney" and that Arrington "could be his cocounsel."

{¶ 40} Judge Wollscheid asserts that she did not recognize Omniversal Media as a media company, noting that it was not a local company. She then looked up the name of the company on the internet and discovered that it was a "Youtuber." Judge Wollscheid states that she denied the first media-access request because she "did not believe this to be a legitimate request." The judge says that she denied the second media-access request because it had "already become apparent that the more of an audience that Mr. Henderson had the more[] he would be disruptive. [She] felt allowing this would only create more issues for the court's docket and ability to conduct the scheduled hearing [in a] timely and orderly manner."

{¶ 41} Judge Wollscheid admits that Henderson filed a motion for continuance on August 21. Because it was filed at the last minute, the judge "was not inclined to grant the motion and intended to address the issue of timeliness at the hearing on the next day." The judge states that the clerk of courts provided Henderson with the public records he had requested in open court.

### Disqualification of a Municipal-Court Judge

{¶ 42} As set forth above, R.C. 2701.031 provides two specific grounds and a catchall provision for the disqualification of a municipal-court judge. Granting or denying the affidavit of disqualification turns on whether the chief justice determines that the allegations of interest, bias or prejudice, or disqualification alleged in the affidavit exist. R.C. 2701.031 and 2701.03(E).

{¶ 43} The burden falls on the affiant to submit "specific allegations on which the claim of interest, bias, prejudice, or disqualification is based and the facts to support each of those allegations." R.C. 2701.03(B)(1). Therefore, "[a]n affidavit must describe with specificity and particularity those facts alleged to support the claim." *In re Disqualification of Mitrovich*, 2003-Ohio-7358, ¶ 4.

**{¶ 44}** Here, Henderson alleges that Judge Wollscheid is biased and prejudiced against him and that the judge should be disqualified to avoid the appearance of impropriety.

**{¶ 45}** R.C. 2701.031 "speaks in terms of *actual* bias and prejudice." (Emphasis in original.) *In re Disqualification of Schooley*, 2023-Ohio-4332, ¶ 19. The General Assembly did not define "bias or prejudice" for purposes of the statute. However, as defined in prior disqualification cases, "[t]he term 'bias or prejudice' 'implies a hostile feeling or spirit of ill-will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'" *In re Disqualification of O'Neill*, 2002-Ohio-7479, ¶ 14, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469 (1956). "'Bias or prejudice on the part of a judge will not be presumed. In fact, the law presumes that a judge is unbiased and unprejudiced in the matters over which he presides, and bias or prejudice must be strong enough to overcome the presumption of his integrity.'" *Id.* at ¶ 16, quoting 48A C.J.S., Judges, § 108, at 731 (1981). A determination of whether a judge is biased or prejudiced is based on the judge's words and/or actions and whether those words and/or actions convey that the judge is predisposed to a particular outcome of a case. *In re Disqualification of Berhalter*, 2023-Ohio-4881, ¶ 28.

**{¶ 46}** "A judge's subjective bias, however, is not easy to discern. The United States Supreme Court has recognized that '[t]o establish an enforceable and workable framework, the Court's precedents [also] apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present.'" (Bracketed text in original.) *In re Disqualification of Clark*, 2023-Ohio-4774, ¶ 47, quoting *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Under an objective standard, "[t]he question is '"whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of

16

a case.'"" *United States v. Melton*, 738 F.3d 903, 905 (8th Cir. 2013), quoting *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (en banc), quoting *In re Kansas Pub. Emps. Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996). "'[T]hese outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.'" *In re Nettles*, 394 F.3d 1001, 1002 (7th Cir. 2005), quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990).

{¶ 47} A judge is "otherwise . . . disqualified" under R.C. 2701.031 when none of the express bases for disqualification—interest, relation to a party, bias, or prejudice—apply but grounds for disqualification exist. *See Schooley* at ¶ 19. "[E]ven in cases in which no evidence of actual bias or prejudice is apparent, a judge's disqualification may be appropriate to avoid an appearance of impropriety or when the public's confidence in the integrity of the judicial system is at issue." *In re Disqualification of Crawford*, 2017-Ohio-9428, ¶ 6. In addition, an ex parte communication between a judge and a party may be a ground for disqualification when "the communication either was initiated by the judge or addressed substantive matters in the pending case." *In re Disqualification of Calabrese*, 2002-Ohio-7475, ¶ 2. Jud.Cond.R. 2.11 sets forth additional circumstances when a judge must be disqualified, including when a family member of the judge has an economic interest in the subject matter in controversy, Jud.Cond.R. 2.11(A)(3), and when the judge likely will be a material witness in the proceeding, Jud.Cond.R. 2.11(A)(2)(d).

{¶ 48} These examples are not exhaustive, but they illustrate that a judge may still be disqualified even when the express statutory grounds for disqualification are not applicable.

{¶ 49} As noted above, a judge may be disqualified to avoid an appearance of impropriety. An appearance of impropriety exists when "'the [judge's] conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 888 (2009), quoting

American Bar Association, Annotated Model Code of Judicial Conduct, Canon 2A, Commentary (2004); *see also id.* at 890 (noting that the codes of judicial conduct "provide more protection than due process requires"). Again, the perspective of a reasonable and objective person is considered, and that person "is presumed to be fully informed of all the relevant facts in the record—not isolated facts divorced from their larger context." *In re Disqualification of Gall*, 2013-Ohio-1319, ¶ 6.

**Analysis**

{¶ 50} Because Henderson bases both allegations on the same evidence, the allegations are analyzed together. For the reasons explained below, although Henderson has not established that Judge Wollscheid is or appears to be biased or prejudiced against him, an objective observer with full knowledge of the facts would harbor serious doubts about whether Henderson could receive a fair and impartial trial before Judge Wollscheid. Therefore, to allay any concerns about the fairness and integrity of the proceedings and to ensure the parties and public the unquestioned neutrality of the trial judge, Judge Wollscheid is disqualified from presiding over the underlying case.

{¶ 51} As stated above, Henderson argues that Judge Wollscheid's words and actions toward him and the actions of the municipal-court clerks support his claims that the judge should be disqualified. Turning first to his claim about the actions of the clerks: Henderson does not state that Judge Wollscheid was present when the clerks labeled him "disruptive" and had police remove him from Washington Court House Municipal Court. A determination of whether a judge is biased or prejudiced, however, is based on the judge's words or actions, not another's words or actions. *See Berhalter*, 2023-Ohio-4881, at ¶ 28. Therefore, actions that the clerks took do not support the claim that Judge Wollscheid should be disqualified.

18

{¶ 52} Henderson also points to Judge Wollscheid's words and actions during the arraignment hearing as well as her denial of the media-access requests in support of his claims that the judge should be disqualified.

{¶ 53} Judge Wollscheid knew that Henderson wanted to represent himself. But instead of proceeding with the inquiry required by Crim.R. 44(B), she appointed counsel. The judge states that she believed that "to protect Mr. Henderson's rights [she] [had to] appoint counsel."

{¶ 54} The United States Supreme Court in *Faretta v. California* recognized that a criminal defendant has a constitutional right to self-representation under the Sixth Amendment to the United States Constitution. 422 U.S. 806, 819 (1975). And in *State v. Neyland*, 2014-Ohio-1914, ¶ 71, this court explained that when a defendant has voluntarily, knowingly, and intelligently exercised his or her constitutional right to self-representation, the trial court shall permit the defendant to proceed to defend himself or herself without counsel. It is incumbent on the trial court to ensure that the defendant is "made aware of the dangers and disadvantages of self-representation." *Faretta* at 835. "The determination of whether there has been an intelligent waiver of [the] right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

{¶ 55} This court has "recognized that '[o]nce the right to counsel is properly waived, trial courts are *permitted* to appoint standby counsel to assist the otherwise pro se defendant.'" (Emphasis added.) *State v. Obermiller*, 2016-Ohio-1594, ¶ 50, quoting *State v. Martin*, 2004-Ohio-5471, ¶ 28. Standby counsel is there to aid the accused if the accused requests help and to be available if the termination of self-representation becomes necessary. *Faretta* at 834, fn. 46.

{¶ 56} This court has cautioned, however, that when standby counsel is appointed, there are limits to his or her involvement. *See Martin* at ¶ 33. An overly

zealous standby counsel who essentially serves as cocounsel creates the problems inherent in "hybrid representation" that may impinge on the right to self-representation. *Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006); *see also Martin* at ¶ 32-33. This relationship can create confusion as to who is the ultimate decision-maker. *Martin* at ¶ 33. Hybrid representation may also create ethical concerns for standby counsel if there are disagreements with the accused over pretrial and trial strategies, and it may present trial-management challenges for the judge. *Id.* Hybrid representation also raises serious questions about the boundaries between the defendant and counsel and whether the defendant has waived the right to self-representation. *Id.* at ¶ 34-36.

{¶ 57} The journalized entry appointing Arrington counsel in the underlying criminal case was not submitted as evidence with the affidavit of disqualification or Judge Wollscheid's response. In the affidavit of disqualification, Henderson calls Arrington "standby counsel," but the judge's response says that she appointed Arrington as counsel. And, importantly, Arrington filed a notice of appearance as Henderson's counsel, so it is apparent that Arrington did not consider himself as limited to "standby counsel." Further, he filed a motion on Henderson's behalf that waived Henderson's right to a speedy trial, which he could not have done if he had been acting solely as standby counsel. It is manifest that Arrington believed that he was counsel of record and therefore in control. This confusion about Arrington's role plagued the underlying case and frustrated Henderson.

{¶ 58} This confusion played out during the pretrial hearing before Judge Beathard: Henderson attempted to raise matters that Arrington had failed to address only to be told by Judge Beathard not to speak. It also appears that Arrington tried to dissuade Henderson from speaking but Henderson continued to assert himself, insisting that he had a constitutional right to speak and objecting to the denial of Omniversal Media's media-access request. Henderson suggests that Arrington

20

refused to follow his instructions by failing to schedule suppression and probable-cause hearings, rejecting Henderson's constitutional arguments, and failing to demand discovery from the State, which led him to file the "notice of disqualification and discharge" of Arrington.

{¶ 59} And despite Henderson's unambiguous assertion of his right to a speedy trial, which required the State to bring him to trial within 90 days, Judge Wollscheid tried to persuade him to waive that right to give them "more room to work with" if he wanted a pretrial. The judge made clear that the case would be scheduled according to her and Arrington's schedules, not Henderson's. Henderson then again invoked his right to self-representation by telling the judge that he would not accept appointed counsel if that meant he had to follow Arrington's schedule, and he asserted that the judge should consider his schedule and that he was entitled to a pretrial in addition to a speedy trial. Yet despite all of this, Arrington waived Henderson's right to a speedy trial even though, Henderson asserts, Arrington did not have his permission to waive his rights.

{¶ 60} R.C. 2701.031 empowers the chief justice to pass upon the disqualification of a municipal-court judge or a county-court judge. But that power does not give the chief justice unilateral authority to resolve legal issues that are subject to appellate review. *In re Disqualification Gallagher*, 2023-Ohio-2977, ¶ 50. Further, an affidavit of disqualification is also "not the appropriate mechanism for determining whether a judge has followed the Code of Judicial Conduct." *In re Disqualification of Capper*, 2012-Ohio-6287, ¶ 19. Judicial-misconduct complaints are heard by the Board of Professional Conduct, *see* Gov.Bar R. V(2)(B), and ultimately decided by all justices of this court, *see* Gov.Bar R. V(17)(D), after an independent investigation by the Office of Disciplinary Counsel or a certified grievance committee of the Ohio State Bar Association, *see* Gov.Bar R. V(4) and (5). The focus of the affidavit-of-disqualification proceeding is on the judge's words or actions. Therefore, Judge

Wollscheid's actions interfering with Henderson's rights to self-representation and to a speedy trial, while appearing to be improper, do not by themselves provide a basis to disqualify her from the underlying case.

{¶ 61} But although it is well established that adverse rulings do not on their own require the disqualification of a judge, "it has also been recognized that 'a judge could be disqualified if his or her adverse rulings were accompanied by words or conduct that call into question the manner in which the proceedings are being conducted.'" *Clark*, 2023-Ohio-4774, at ¶ 51, quoting *In re Disqualification of Knece*, 2014-Ohio-1414, ¶ 10. And this case is not just about Judge Wollscheid's treatment of Henderson's constitutional rights. An additional issue is the judge's denial of media access to the underlying proceeding.

{¶ 62} After Henderson's arraignment, Caden Reed and Ethan Womack, both representing Omniversal Media L.L.C., submitted media-access requests pursuant to Sup.R. 12. Henderson claims that Judge Wollscheid's denial of those requests without first holding a hearing is proof of the judge's bias and prejudice against him and creates the appearance of impropriety requiring the judge's disqualification from the underlying criminal case.

{¶ 63} The Sixth Amendment guarantees the right to a public trial. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). A public trial ensures a fair trial. *Id.* Similarly, the First Amendment grants the public and the press a qualified right of access to a criminal trial. *Id.* at 44. "Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" (Citation omitted.) *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982), quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966). That protection "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.* at 604. "[P]ublic access to the criminal trial," while not absolute, "fosters an appearance of fairness,

thereby heightening public respect for the judicial process." *Id.* at 606. The justification for denying the press access to a criminal trial, therefore, "must be a weighty one." *Id.* And any denial of access to the press and the public must be "necessitated by a compelling governmental interest, and . . . narrowly tailored to serve that interest." *Id.* at 607.

{¶ 64} Article I, Section 16 of the Ohio Constitution also guarantees the right to open courts: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." As we recently explained, "our Constitution protects public access to court proceedings that extends further than the United States Supreme Court's interpretation of the free speech and press guarantees of the federal Constitution." *State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, ¶ 48. There is a presumption of public access to court proceedings. *See id.* at ¶ 39.

{¶ 65} And Article I, Section 11 of the Ohio Constitution protects the right to free speech: "Every citizen may freely speak, write, and publish his sentiments on all subjects," and "no law shall be passed to restrain or abridge the liberty of speech, or of the press." This court has recognized that the free-speech provision of the Ohio Constitution affords greater protection than the free-speech provision of the First Amendment to the United States Constitution. *Disciplinary Counsel v. Gardner*, 2003-Ohio-4048, ¶ 19.

{¶ 66} In keeping with the constitutional rights to open courts and free speech, Sup.R. 12(A) mandates that "[t]he judge assigned to the trial or hearing *shall* permit the broadcasting or recording by electronic means and the taking of photographs in court proceedings that are open to the public as provided by Ohio law." (Emphasis added.) It is only after the judge consults with the media that the judge may place limitations on where in the courtroom "operators and equipment are to be positioned." *Id.* Therefore, "a trial court may not exclude cameras from

'court proceedings that are open to the public.'" *State v. Sowell*, 2016-Ohio-8025, ¶ 51, quoting Sup.R. 12(A).

**{¶ 67}** In her response to the affidavit of disqualification, Judge Wollscheid states that she declined Womack's media-access request without a hearing because she "did not believe [it] to be a legitimate request." The judge based that decision on her unfamiliarity with the media outlet, on the media outlet's not being local, and on the company's being just a "Youtuber." And she says that she denied Reed's media-access request to avoid giving Henderson an audience for what she characterizes as disruptive behavior.

**{¶ 68}** "The press" protected by the United States and Ohio Constitutions is more than just newspapers, books, magazines, and cable-television networks. *Lamar Advantage GP Co., L.L.C. v. Cincinnati*, 2021-Ohio-3155, ¶ 18. "'The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" *Id.*, quoting *Lovell v. Griffin*, 303 U.S. 444, 452 (1938). "[P]eople during the Framing Era and at the time of the ratification of the Fourteenth Amendment understood that the freedom of the press meant the right of every person to use technology (such as the printing press) to engage in mass communication." *Id.*, citing Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U.Pa.L.Rev. 459, 463 (2012).

**{¶ 69}** For this reason, this court has recognized that "'[t]he basic premise of the First Amendment is that all present instruments of communication, as well as others that inventive genius may bring into being, shall be free from governmental censorship or prohibition.'" *Lamar* at ¶ 48, quoting *Kovacs v. Cooper*, 336 U.S. 77, 102 (1949) (Black, J., dissenting). And "the Supreme Court of the United States has consistently rejected the proposition that the 'institutional press' is afforded more protection by the First Amendment than other speakers." *Id.* at ¶ 19, quoting *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 352

(2010). For this reason, this court recently concluded that the press includes billboard operators, and we held that, as speakers and publishers of speech, they are protected by the rights to freedom of speech and of the press under the First Amendment. *Id.* at ¶ 3, 19, 49.

{¶ 70} The same reasoning dictates that the press also includes citizen journalists who use technology for mass communication. *See State ex rel. Shubert v. Breaux,* 2024-Ohio-2491, ¶ 2, 35 (granting a writ of prohibition barring judge from enforcing orders sealing the court records sought by the relator, a "former journalist"). Citizen journalists—which Henderson has proclaimed himself to be— include bloggers, Xers, Facebookers, YouTubers, Instagrammers, and others who use media that allow citizens to speak and express their views and opinions. All of these can be considered members of the press who enjoy the right to gather the news and the right to publish it—after all, "[t]he protected right to publish the news would be of little value in the absence of sources from which to obtain it," *State ex rel. Dayton Newspapers, Inc. v. Phillips*, 46 Ohio St.2d 457, 459 (1976).

{¶ 71} Sup.R. 12 upholds these principles, and it does not authorize judges to decide for themselves who has a legitimate voice and who does not have a legitimate voice. Nor does it allow a judge to deny media access to broadcast criminal proceedings solely to avoid giving the accused an audience—drawing an audience is the whole point of the press.

{¶ 72} The evidence submitted in support of the affidavit of disqualification does not show that Judge Wollscheid has actual bias or prejudice against Henderson. However, her actions impeding the exercise of Henderson's constitutional rights and denying him the benefit of a trial subject to scrutiny by the press and the public show that a reasonable person with full knowledge of the facts and the law would have serious doubts about whether Henderson would receive a fair and impartial trial before her. Therefore, to allay any concerns about the fairness and integrity of the proceedings and to ensure to the parties and the public

the unquestioned neutrality of the court, Judge Wollscheid is disqualified from presiding over Henderson's case.

### Conclusion

{¶ 73} The affidavit of disqualification is dismissed as to Judge Beathard and granted as to Judge Wollscheid.  The appointment of an assigned judge to preside over the underlying case will be addressed in a separate entry.

———————————